UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT C. ADLER,<br><br>                              Plaintiff,<br><br>           -against-<br><br>PAYWARD, INC. d/b/a KRAKEN,<br><br>                              Defendant. | Case No. 1:18-cv-08100<br><br>**VERIFIED COMPLAINT**<br><br>Civil Action<br><br>JURY TRIAL DEMANDED |

Robert C. Adler ("Plaintiff") by and through his undersigned counsel, Roger K. Marion of Marion & Allen, P.C., as and for his Verified Complaint against defendant Payward, Inc. d/b/a Kraken, alleges as follows:

### NATURE OF THE ACTION

1.     This is an action to enforce the terms of an employment contract seeking unpaid compensation, both financial and seeking the cash value of earned stock shares and equity interest in a private company.

### JURISDICTION AND VENUE

2.     Robert C. Adler is a citizen and resident of the State of New York.

3.     Payward, Inc. was incorporated under the laws of Delaware on September 3, 2013.

4.     On or about September 3, 2013, Payward, Inc. filed a 'Statement and Designation by Foreign Corporation' in the State of California indicating that it would have its primary place of business at 625 S. Street, in Sacramento, California.

5.     Payward, Inc. together with its affiliates and subsidiaries including, without limitation, Payward Ventures, Inc and Infinitude, Ltd. (collectively "Payward") has its current principal place of business is at 237 Kearny Street, San Francisco, California 94108.

6.   Thus Payward is currently a citizen and resident of the state of California.

7.   This Honorable Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1332(a)(1).

8.   Thus there is complete diversity between the parties, which are a New York Plaintiff and Defendants from California and Delaware.

9.   The actual amount in controversy exceeds $75,000 exclusive of interests and costs, in fact the proceeds due to Plaintiff pursuant to his employment contract with Defendant exceeds $700,000.

10.   Venue is proper in this District pursuant to 28 U.S.C.A. § 1391(a)(2) because a substantial part of the events giving rise to the claims herein happened in New York, to wit: at all times relevant herein the Defendant has maintained an office in the City, County and State of New York where Plaintiff worked for Defendant pursuant to an employment contract (the "Contract").

## THE PARTIES

11.   Plaintiff is a natural person residing in Rye Brook, in the State of New York.

12.   At all times material to this action, Defendant Payward was and still is a foreign corporation organized under the laws of Delaware, and existing under the laws of the State of California.

13.   At all times material to this action, Payward maintained offices where Plaintiff was employed by them in the City, County and State of New York (the "New York Office").

14.   From October 1, 2017 to February 28, 2018, the New York Office maintained offices at 205 East 42nd Street, in the City, County and State of New York; thereafter, the New

2

York Office maintained an office at 1201 Broadway, Suite 912, in the City, County and State of New York.

15.   Although Payward maintained an office and conducted regular business in the State of New York, Payward had not filed with the New York Department of Financial Service ("DFS") for a Bit License.

16.   Despite Payward Chief Executive Officer Jesse Powell's very public statements in April 2018 that "We made the wise decision to get the hell out of New York three years ago", Payward did indeed maintain an office in New York and operate a Trading Desk in New York.

17.   The Trading Desk explored forming a Cayman-based hedge fund in order to avoid a) having its trades fall under the DFS definition of Virtual Currency Business Activity and b) having Payward's Exchange Services businesses under the regulatory supervision of DFS. During his tenure at Payward, Plaintiff worked on changing the structure of the Trading Desk; his recommendations were not acted upon and Plaintiff could not unilaterally take steps to change the structure without Payward management's cooperation.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

18.   Upon information and belief Payward was founded in 2011 with the intention to become a Bitcoin exchange.

19.   Payward eventually began operating as "Kraken" as a Bitcoin exchange in 2013.

20.   Upon information and belief Payward has not filed the appropriate papers with any governmental agency in any or all jurisdiction to operate as "Kraken".

21.   Payward never filed a Certificate of Assumed Name to use the business name "Kraken" in New York.

22.   Payward expanded to trading in other forms of encryption-based digital currencies ("Cryptocurrencies") including, without limitation, Ethereum, Bitcoin-cash (which is distinguishable from Bitcoin), Iconomi and Zcash.

23.   Payward historically operated an institutional trading business from its San Francisco headquarters and from an individual's home in Asia.  In April 2017, Payward hired Jonathan Silverman ("Silverman") to head its Institutional Sales and Trading Business and relocate the business to New York.  In May 2017 Silverman began recruiting Plaintiff on behalf of Payward to work under Silverman at Payward as Chief Operating Officer of the Trading Desk.

24.   In June of 2017, Payward flew Plaintiff to San Francisco where Payward senior management including Chief Executive Officer Jesse Powell, Chief Brand Officer Christina Yee, Chief Operating Officer David Ripley and Chief Financial Officer Kaiser Ng ("Ng") met with Plaintiff to discuss hiring him to work with Silverman on the Trading Desk in New York.

25.   On or about August 23, 2017, Payward offered a one-page employment agreement to Plaintiff which Plaintiff counter-signed (the "Employment Contract") a copy of which is at Exhibit A hereto.

26.   Plaintiff worked with Silverman and Jesse Powell on negotiating the terms of Plaintiff's Employment Contract.

27.   Payward or its agents, were the author(s) of the Employment Contract.

28.   As the author of the Employment Contract, all ambiguities in the Employment Contract are to be resolved in favor of Plaintiff and against Payward.

29.   Under the Employment Contract, Plaintiff was to work at a New York Institutional Sales and Trading Desk, (the "Trading Desk") receive a base salary plus participation in a stock option plan, plus a commission of 3.5% of the Trading Desk profit.

30. Despite being contracted for stock options in the stock option plan, Plaintiff never received a copy of a stock option plan from Defendant.

31. Plaintiff relocated the New York workspace for Payward's Trading Desk from Silverman's apartment to a WeWork office location at 205 East 42nd Street. Payward approved that workspace as a temporary solution with the goal of Plaintiff finding an independent office for the Trading Desk in New York. At the direction of Payward, Plaintiff supervised the build-out of the New York Trading Desk space, and had a role in staffing it.

32. Plaintiff worked for the Trading Desk from September 15, 2017 until Plaintiff was terminated on May 29, 2018 with an effective termination date of May 31, 2018.

33. Plaintiff duly performed all of his obligations under his Employment Contract.

34. At no time during Plaintiff's employment at Payward was he given negative feedback on his performance.

35. At no time during Plaintiff's employment at Payward was he given a negative performance review.

36. Payward only paid Plaintiff his base salary.

37. When Plaintiff started at his Trading Desk on September 15, 2017, he reasonably believed from conversations with Silverman, Ng and from the spreadsheets that were used by the Trading Desk and shared with Payward Senior Management in San Francisco that the initial capital of the Trading Desk was cryptocurrency of 500 Bitcoin and 500 Bitcoin-cash and $10,000,000.00 U.S.D.

38. The profit of the Trading Desk would be calculated for any period as the difference between (a) the ending value for that period minus the initial capital of the trading desk, and (b)

the beginning value for that period minus the initial capital, minus the expenses incurred by the Trading Desk over that period ("Trading Desk Profit").

39.   From September 15, 2017 to year-end 2017, the Trading Desk made a Trading Desk Profit (before expenses) of approximately $19,000,000.00 U.S.D. for Payward.

40.   Plaintiff does not have access to the books and records of the Trading Desk, nor access to emails in which Plaintiff and Payward discussed the 2017 Trading Desk Profit calculation because his laptop was seized by Payward on May 29, 2018 when Plaintiff was terminated without warning and all Plaintiff's access to Payward systems including email and stored files was terminated.

41.   By the end of 2017, Plaintiff had earned a 2017 sales commission of approximately $600,000.00 U.S.D. calculated as 3.5% of the $19 million Trading Desk Profit less expenses. None of this commission due Plaintiff was paid by Payward.

42.   At the end of 2017, Silverman was no longer working at the Payward Trading Desk, and Plaintiff took over management of the Trading Desk.

43.   As of January 1, 2018, Plaintiff managed the Trading Desk, including the record keeping for the Trading Desk, and reported directly to Jesse Powell.

44.   Plaintiff duly performed all of his obligations to manage the Trading Desk, including continuing the keeping of the books and records of the Trading Desk.

45.   Plaintiff used the same accepted accounting methods as his predecessor to track capital and profits, and sent frequent updates to Payward.

46.   In April 2018, Ng sent Plaintiff an email detailing his calculation for 2017 Trading Desk Profit.  At that time, he calculated Plaintiff's 2017 commission at less than $20,000 USD; subsequently, Ng changed the calculation and sent Plaintiff an email detailing his calculations

that contended that the Trading Desk lost money in the September 15, 2017 to December 31, 2017 time period and thus tried to claim that Plaintiff was owed no commission.

47.   Ng's calculation of 2017 Trading Desk expenses employed a twenty percent (20%) cost of capital. This figure was significantly above anything that had been previously discussed with Silverman or the Plaintiff and was significantly higher than industry standard.

48.   Plaintiff disputed Payward's calculations of 2017 Trading Desk Profit and thus of Plaintiff's commissions earned in 2017.

49.   Payward's calculation of the cost of capital for the Trading Desk in first quarter of 2018 was five percent (5%).

50.   Trading Desk Profits for the first quarter of 2018 were $2,900,000 by Payward's calculations; $3,400,000 by Plaintiff's calculations.

51.   Therefore, Plaintiff is additionally due 2018 first quarter commissions of over $100,000.00.

52.   Payward did not offer finalized calculations to Plaintiff's sales commissions earned in the first quarter of 2018, and did not pay Plaintiff any commissions.

53.   On May 21, 2018, Payward offered Plaintiff a superseding employment contract which was far longer and legally complex than the Employment Contract between them.

54.   Plaintiff asked a lawyer to review the proposed superseding employment contract.

55.   Plaintiff was fired without cause five business days after receiving the new proposed employment contract and before providing any comments on this new contract to Payward.

56.   Plaintiff was told that his role was being eliminated.

57.   Upon information and belief, Plaintiff was fired because Payward did not want to pay Plaintiff's correctly calculated commissions.

58.   Finally, Payward had a written policy (the "Employee Referral Bonus Policy") that if an employee recommended a person to be hired by Payward, and the recommended person was hired, then Payward would pay the employee making the recommendation $5,000.00 (the "Employee Referral Bonus").

59.   In reasonable reliance upon Payward's Employee Referral Bonus Policy, Plaintiff recommended to Payward that a person named Nelson Minier ("Minier") be hired.

60.   Upon Plaintiff's recommendation, Payward interviewed Minier and hired Minier.

61.   Payward refused to pay Plaintiff the Employee Referral Bonus.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

62.   Plaintiff repeats and restates the allegations set forth in each preceding paragraph of this Complaint as if set forth fully herein.

63.   Payward materially breached the Employment Contract by failing to remit to Plaintiff the bonus commissions that Plaintiff is due pursuant to the Employment Contract.

64.   Said breach was a breach of the 5th paragraph of the Employment Contract.

65.   Payward terminated Plaintiff's employment without cause.

66.   Payward failed and refused to pay Plaintiff his bonus commissions despite due demand.

67.   As a direct and proximate result of Payward's breach of the Employment Contract, Plaintiff has been damaged in an amount to be determined at trial, but not less than $700,000.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract - Employee Referral Bonus)

68.   Plaintiff repeats and restates the allegations set forth in each preceding paragraph of this Complaint as if set forth fully herein.

69.   Payward materially breached the Employee Referral Bonus Policy by failing to remit to Plaintiff the $5,000.00 Employee Referral Bonus for the hiring of Minier despite due demand.

70.   As a direct and proximate result of Payward's breach of the Employee Referral Bonus Policy, Plaintiff has been damaged in an amount to be determined at trial, but not less than $5,000.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Good Faith and Fair Dealing)

71.   Plaintiff repeats and restates the allegations set forth in each preceding paragraph of this Complaint as if set forth fully herein.

72.   A covenant of good faith and fair dealing is implied in the Employment Contract.

73.   By Payward's aforestated material breaches of the Employment Contract, and demands to alter the Employment Contract, and firing Plaintiff for declining to accept their intentional miscalculation of this commission bonus, Payward breached the covenant of good faith and fair dealing implied in the Employment Contract.

74.   As a direct and proximate result of Payward's breach of the covenant of good faith and fair dealing implied in the Employment Contract, Plaintiff has been further damaged in an amount to be determined at trial, but not less than $705,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Statutory Damages For Failure to Pay Sales Commissions)

75.   Plaintiff repeats and restates the allegations set forth in each preceding paragraph of this Complaint as if set forth fully herein.

76.   Payward failed to pay Plaintiff all commissions Plaintiff earned before termination (the "Pre-Termination Commissions").

77.   More than five (5) days has passed after Plaintiff was terminated.

78.   More than five (5) days has passed after Pre-Termination Commissions became due to Plaintiff.

79.   Based on the foregoing, Payward has violated and failed to comply with the terms of New York State Labor Law § 191-C, and Plaintiff is entitled to a statutory doubling of his Commission-based damages, doubling $700,000.00 to $1,400,000.00.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (New York Labor Law and the Wage Theft Prevention Act)

80.   Plaintiff repeats and restates the allegations set forth in each preceding paragraph of this Complaint as if set forth fully herein.

81.   Payward failed to pay Plaintiff his first quarter 2018 commissions totaling over $100,000.00.

82.   Payward did not furnish Plaintiff a statement with every payment of wages listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages with respect to his 2018 commissions or his Employee Referral Bonus.

83.   Plaintiff's unpaid compensation overdue from Payward exceeds $705,000.00.

84.   Pursuant to New York Labor Law, Plaintiff is due from Payward prejudgment interest, repayment of his attorneys' fees and liquidated damages equal to 100% of the value of all Plaintiff's unpaid compensation.

85.   Pursuant to the New York Labor Law and the New York Wage Theft Prevention Act., Plaintiff should also be required to pay double damages, punitive damages, pre-judgment interest, the attorneys' fees reasonably expended in this action, as well as all applicable statutory penalties.

86.   As a direct and proximate result of Payward's violations of New York Labor Law and the New York Wage Theft Prevention Act, Plaintiff has been damaged in an amount to be determined at trial, but not less than $1,410,000.00.

**WHEREFORE**, Plaintiff Robert C. Adler demands judgment as follows:

A.   On the First Cause of Action, awarding a judgment an amount to be determined at trial, but not less than $700,000.00;

B.   On the Second Cause of Action, awarding a judgment an amount to be determined at trial, but not less than an additional $5,000.00;

C.   On the Third Cause of Action, awarding a judgment in an amount not less than $705,000.00;

D.   On the Fourth Cause of Action, awarding a judgment in an amount not less than $1,400,000.00 plus all costs of the action and attorneys' fees expended in this action;

E.   On the Fifth Cause of Action, awarding a judgment in an amount not less than $1,410,000.00 plus all costs of the action and attorneys' fees expended in this action;

F.    On each Cause of Action, awarding Plaintiff appropriate interest, plus the costs and disbursements incurred herein, and such other and additional relief as the Court deems just and proper.

Dated: New York, New York
       August 24, 2018

Marion & Allen, P.C.

By: Rpger K. Marion, Esq.
488 Madison Avenue, Suite 1120
New York, New York 10022
Telephone 212-658-0350
Facsimile: 212-308-8582
E-Mail: rmarion@rogermarion.com
Attorneys for Plaintiff

12

<u>VERIFICATION</u>

STATE OF NEW YORK          )
                          )  ss:
COUNTY OF NEW YORK    )

Robert C. Adler, being duly sworn deposes and says:

I am the plaintiff reflected in the caption of this Verified Complaint.  I have read the
foregoing Verified Complaint, and know the contents thereof; the same is true to my personal
knowledge, except as to the matters therein stated to be alleged on information and belief, and as
to the matters, I believe them to be true.

_____
Robert C. Adler

Sworn to before me this
__31st__ day of August, 2018

_____
Notary Public

ROGER K. MARION
Notary Public, State of New York
No. 02MA6034949
Qualified in New York County
Commission Expires December 20, 2019

13