UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT C. ADLER,<br><br>       Plaintiff,<br><br>   -against-<br><br>PAYWARD, INC. d/b/a KRAKEN,<br><br>       Defendant. | Case No. 1:18-cv-08100 (PAC)(DCF)<br><br>**AMENDED**<br>**VERIFIED COMPLAINT**<br><br>Civil Action<br><br><br>JURY TRIAL DEMANDED |

Robert C. Adler ("Plaintiff") by and through his undersigned counsel, Roger K. Marion of Marion & Allen, P.C., as and for his Verified Complaint against defendant Payward, Inc. d/b/a Kraken, alleges as follows:

## NATURE OF THE ACTION

1. This is an action to enforce the terms of an employment contract seeking unpaid compensation, both financial and seeking the cash value of earned stock shares and equity interest in a private company.

## JURISDICTION AND VENUE

2. Robert C. Adler is a citizen and resident of the State of New York.

3. Payward, Inc. was incorporated under the laws of Delaware on September 3, 2013.

4. On or about September 3, 2013, Payward, Inc. filed a 'Statement and Designation by Foreign Corporation' in the State of California indicating that it would have its primary place of business at 625 S. Street, in Sacramento, California.

5. Payward, Inc. together with its affiliates and subsidiaries including, without limitation, Payward Ventures, Inc and Infinitude, Ltd. (collectively "Payward") has its current principal place of business is at 237 Kearny Street, San Francisco, California 94108.

1

6.     Thus Payward is currently a citizen and resident of the state of California.

7.     This Honorable Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1332(a)(1).

8.     Thus there is complete diversity between the parties, which are a New York Plaintiff and Defendants from California and Delaware.

9.     The actual amount in controversy exceeds $75,000 exclusive of interests and costs, in fact the proceeds due to Plaintiff pursuant to his employment contract with Defendant exceeds $700,000.

10.     Venue is proper in this District pursuant to 28 U.S.C.A. § 1391(a)(2) because a substantial part of the events giving rise to the claims herein happened in New York, to wit: at all times relevant herein the Defendant has maintained an office in the City, County and State of New York where Plaintiff worked for Defendant pursuant to an employment contract (the "Employment Contract").

## THE PARTIES

11.     Plaintiff is a natural person residing in in the County, City and State of New York, with a second residence in Whippany, New Jersey.

12.     At all times material to this action, Defendant Payward was and still is a foreign corporation organized under the laws of Delaware, and existing under the laws of the State of California.

13.     At all times material to this action, Payward maintained offices where Plaintiff was employed by them in the City, County and State of New York (the "New York Office").

14.     From October 1, 2017 to February 28, 2018, the New York Office maintained offices at 205 East 42nd Street, in the City, County and State of New York; thereafter, the New

2

York Office maintained an office at 1201 Broadway, Suite 912, in the City, County and State of New York.

15.    Although Payward maintained an office and conducted regular business in the State of New York, Payward had not filed with the New York Department of Financial Service ("DFS") for a Bit License.

16.    Despite Payward Chief Executive Officer Jesse Powell's very public statements in April 2018 that "We made the wise decision to get the hell out of New York three years ago", Payward did indeed maintain an office in New York and operate a Trading Desk in New York during the September 2017 – May 2018 period when Plaintiff worked for Payward.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

17.    Upon information and belief Payward was founded in 2011 with the intention to become a Bitcoin exchange.

18.    Payward eventually began operating as "Kraken" as a Bitcoin exchange in 2013.

19.    Upon information and belief Payward has not filed the appropriate papers with any governmental agency in any or all jurisdiction to operate as "Kraken".

20.    Payward never filed a Certificate of Assumed Name to use the business name "Kraken" in New York.

21.    Payward expanded to trading in other forms of encryption-based digital currencies ("Cryptocurrencies") including, without limitation, Ethereum, Bitcoin Cash (which is distinguishable from Bitcoin), Iconomi and Zcash.

22.    Payward historically operated an institutional trading business from its San Francisco headquarters and from an individual's home in Asia.  In April 2017, Payward hired Jonathan Silverman ("Silverman") to head its Institutional Sales and Trading Business and

3

relocate the business to New York.  In May 2017 Silverman began recruiting Plaintiff on behalf of Payward to work under Silverman at Payward as Chief Operating Officer of the Trading Desk.

23.   In June of 2017, Payward flew Plaintiff to San Francisco where Payward senior management including Chief Executive Officer Jesse Powell, Chief Brand Officer Christina Yee, Chief Operating Officer David Ripley and Chief Financial Officer Kaiser Ng ("Ng") met with Plaintiff to discuss hiring him to work with Silverman on the Trading Desk in New York.

24.   On or about August 23, 2017, Payward offered a one-page employment agreement to Plaintiff which Plaintiff counter-signed (the "Employment Contract") a copy of which is at Exhibit A hereto.

25.   Plaintiff worked with Silverman and Jesse Powell on negotiating the terms of Plaintiff's Employment Contract.

26.   Payward or its agents, were the author(s) of the Employment Contract.

27.    As the author of the Employment Contract, all ambiguities in the Employment Contract are to be resolved in favor of Plaintiff and against Payward.

28.   Under the Employment Contract, Plaintiff was to work at a New York Institutional Sales and Trading Desk, (the "Trading Desk") receive a base salary, receive 20,000 stock options plus participation in a stock option plan, and receive a commission of 3.5% of the Trading Desk profit.  The base salary of $125,000 was significantly below Plaintiff's base salary of $350,000 at his previous employer; Plaintiff accepted the reduction in base salary because his compensation was also going to include a portion of the Trading Desk profit.

29.   Despite being contracted for stock options in the stock option plan, Plaintiff never received a copy of a stock option plan from Defendant.

30.   Plaintiff relocated the New York workspace for Payward's Trading Desk from Silverman's apartment to a WeWork office location at 205 East 42nd Street.  Payward approved that workspace as a temporary solution with the goal of Plaintiff finding an independent office for the Trading Desk in New York. At the direction of Payward, Plaintiff supervised the build-out of the New York Trading Desk space, and had a role in staffing it.

31.   Plaintiff worked for the Trading Desk from September 15, 2017 until Plaintiff was terminated on May 29, 2018 with an effective termination date of May 31, 2018.

32.   Plaintiff duly performed all of his obligations under his Employment Contract.

33.   At no time during Plaintiff's employment at Payward was he given negative feedback on his performance.

34.   At no time during Plaintiff's employment at Payward was he given a negative performance review.

35.   Payward only paid Plaintiff his base salary.

36.   When Plaintiff started at his Trading Desk on September 15, 2017, he reasonably believed from conversations with Silverman, Ng and from the spreadsheets that were used by the Trading Desk and shared with Payward Senior Management in San Francisco that the initial capital of the Trading Desk was cryptocurrency of 500 Bitcoin and 500 Bitcoin Cash and $10,000,000.00 U.S.D.

37.   During the fall of 2017, Plaintiff drafted written procedures for calculating the Trading Desk Profit and sent them to Jesse Powell, the CEO of Payward.

38.   The profit of the Trading Desk would be calculated for any period as the difference between (a) the ending value for that period minus the initial capital of the trading desk, and (b)

the beginning value for that period minus the initial capital, minus the expenses incurred by the Trading Desk over that period ("Trading Desk Profit").

39.   From September 15, 2017 to year-end 2017, the Trading Desk made a Trading Desk Profit of approximately $17,000,000.00 U.S.D. for Payward.   This calculation was derived from and embedded in a spreadsheet that was used by the Trading Desk and Ng for the entire period that Plaintiff worked at Payward.

40.   Plaintiff does not have access to the books and records of the Trading Desk, nor access to emails in which Plaintiff and Payward discussed the 2017 Trading Desk Profit calculation because his laptop was seized by Payward on May 29, 2018 when Plaintiff was terminated without warning or cause and all Plaintiff's access to Payward systems including email and stored files was terminated.

41.   By the end of 2017, Plaintiff had earned a 2017 sales commission of approximately $600,000.00 U.S.D. calculated as 3.5% of the $17 million Trading Desk Profit (which accounts for roughly $2 million of expenses estimated by Plaintiff conservatively).   None of this commission due Plaintiff was paid by Payward.

42.   At the end of 2017, Silverman was no longer working at the Payward Trading Desk, and Plaintiff took over management of the Trading Desk.

43.   Plaintiff's bonus under the Employment Contract was directly and inexorably linked to the labor and services Plaintiff personally rendered at the Trading Desk and the profit of the trading desk was dependent upon Plaintiff's work.

44.   As of January 1, 2018, Plaintiff managed the Trading Desk, including the record keeping for the Trading Desk, and reported directly to Jesse Powell.

45.   Plaintiff duly performed all of his obligations to manage the Trading Desk, including continuing the keeping of the books and records of the Trading Desk.

46.   Plaintiff used the same accepted accounting methods as his predecessor to track capital and profits, and sent frequent updates to Payward.

47.   From January 2018 to May 2018, Plaintiff and Ng were in constant discussions about the accounting for the Trading Desk for 2017.  Because Silverman was no longer at Payward and because the records for the Trading Desk prior to Plaintiff joining Payward were disorganized and not complete, there was significant work done to reconcile an accounting of the Trading Desk in 2017.

48.   While Plaintiff and Ng did not reach post-contracting consensus on the calculation of Trading Desk Profit, at no point was Plaintiff's entitlement to 3.5% of the Trading Desk profit ever questioned or discussed.

49.   In one of Ng's calculations of 2017 Trading Desk Profit, a twenty percent (20%) cost of capital was used.  This figure was significantly above anything that had been previously discussed with Silverman or the Plaintiff and was significantly higher than industry standard.  In fact, Payward then used a cost of capital for the Trading Desk in the first quarter of 2018 of 5%.

50.   Trading Desk Profits for the first quarter of 2018 were $2,900,000 by Payward's calculations; $3,400,000 by Plaintiff's calculations.

51.   It is Plaintiff's understanding that another member of the Payward trading desk was paid out a bonus based on the $2,900,000 figure.

52.   The difference in the calculations of Trading Desk Profit for the first quarter of 2018 was in the treatment of Stellar Lumens, which were given gratis to Bitcoin holders as of June 26, 2017 who claimed them by August 27, 2017.  Since Ng and Payward did not calculate

the value of the Stellar Lumens in the 2017 Trading Desk Profit, Plaintiff included them in the first quarter of 2018.

53.    Therefore, Plaintiff is additionally due 2018 first quarter commissions of over $100,000.00.

54.    Payward did pay Plaintiff any commissions for the first quarter of 2018.

55.    On or around April 24, 2018, Plaintiff was sent a Confidential Information and Invention Assignment Agreement (CIIAA) backdated to September 15, 2017 to execute.

56.    On May 21, 2018, Payward offered Plaintiff a superseding employment contract which was far longer and legally complex than the Employment Contract between them.

57.    Plaintiff asked a lawyer to review the proposed superseding employment contract.

58.    At the same time as Plaintiff was providing comments to the CIIAA and reviewing the new employment contract, Plaintiff reasonably believed that he and Ng were getting closer to understanding the differences in their calculations of the Trading Desk Profit and had begun to discuss a compromise solution.

59.    Plaintiff was fired without cause five business days after receiving the new proposed employment contract and before providing any comments on this new contract to Payward.

60.    Plaintiff was told that his role was being eliminated.

61.    Upon information and belief, Plaintiff was fired because Payward did not want to pay Plaintiff's commissions for 2017 and the first quarter of 2018.

62.    Plaintiff was never provided a copy of the Payward Employee Stock Option Plan to which he was entitled per his original Employment Contract.

63.   It is customary in the financial services industry to vest stock and stock options if an employee is terminated without cause.

64.   As Plaintiff was terminated without cause, Plaintiff is entitled to vesting of his 20,000 Payward stock options, or the value thereof.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

65.   Plaintiff repeats and restates the allegations set forth in each preceding paragraph of this Complaint as if set forth fully herein.

66.   Payward materially breached the Employment Contract by failing to remit to Plaintiff the bonus commissions that Plaintiff is due pursuant to the Employment Contract.

67.   Said breach was a breach of the 5th paragraph of the Employment Contract.

68.   Payward terminated Plaintiff's employment without cause.

69.   Payward failed and refused to pay Plaintiff his bonus commissions despite due demand.

70.   As a direct and proximate result of Payward's breach of the Employment Contract, Plaintiff has been damaged in an amount to be determined at trial, but not less than $700,000 plus the value of his vested stock options.

71.   Payward failed to pay Plaintiff all commissions Plaintiff earned before termination (the "Pre-Termination Commissions").

72.   All of said compensation was fully earned, vested and payable before Plaintiff's employment at Payward was terminated.

73.   More than five (5) days and more than one regular pay day has passed after Plaintiff was terminated.

74.    More than five (5) days and more than one regular pay day has passed after Pre-Termination Commissions became due to Plaintiff.

75.    Defendant has failed and refused to timely pay Plaintiff in violation of New York State Labor Law § 191(3).

76.    Defendant has also failed and refused to timely pay Plaintiff in violation of New York State Labor Law § 191(1)(c).

77.    Based on the foregoing, Payward has violated and failed to comply with the terms of New York State Labor Law §§ 191 and 198, and Plaintiff is therefore entitled to a statutory doubling of his Commission-based damages, doubling $700,000.00 to $1,400,000.00.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Good Faith and Fair Dealing)

78.    Plaintiff repeats and restates the allegations set forth in each preceding paragraph of this Complaint as if set forth fully herein.

79.    A covenant of good faith and fair dealing is implied in the Employment Contract.

80.    By Payward's aforestated material breaches of the Employment Contract, and attempt to alter the Employment Contract, and firing Plaintiff rather than pay him his commission bonus, Payward breached the covenant of good faith and fair dealing implied in the Employment Contract.

81.    As a direct and proximate result of Payward's breach of the covenant of good faith and fair dealing implied in the Employment Contract, Plaintiff has been further damaged in an amount to be determined at trial, but not less than $700,000.

## AS AND FOR A THIRD CAUSE OF ACTION
### (<u>Quantum Meruit</u>)

82.    Plaintiff repeats and restates the allegations set forth in each preceding paragraph of this Complaint as if set forth fully herein.

83.    From September 15, 2017 to year-end 2017, the Trading Desk made a Trading Desk Profit of approximately $17,000,000.00 U.S.D. for Payward.   Trading Desk Profits for the first quarter of 2018 were $2,900,000 by Payward's calculations; $3,400,000 by Plaintiff's calculations.

84.    The fair and agreed value of the goods and services Plaintiff provided to Payward is not less than $700,000.00, plus the value of the options being granted by Payward under it first Stock Option Plan.

85.    Payward owes Plaintiff the reasonable value of his services, which services resulted in substantial profit to Payward.

86.    That *if* the finder of fact in this action determines that there was no enforceable contract between the parties, then in the alternative Plaintiff is entitled to recover from Defendant, in quantum meruit, for the reasonable value of services Plaintiff rendered.

**WHEREFORE**, Plaintiff Robert C. Adler demands judgment as follows:

A.    On the First Cause of Action, awarding a judgment an amount to be determined at trial, but not less than $1.400,000.00;

B.    On the Second Cause of Action, awarding a judgment in an amount not less than $1,400,000.00;

C.    On the Third Cause of Action, awarding a judgment in an amount not less than $700,000.00 plus all costs of the action and attorneys' fees expended in this action;

       D.    On each Cause of Action, awarding Plaintiff appropriate interest, plus the costs and disbursements incurred herein, and such other and additional relief as the Court deems just and proper.

**JURY DEMAND**

       Plaintiff respectfully requests and demands a civil jury determine the facts and award in this action.


Dated: New York, New York
       November 16, 2020


                           Marion & Allen, P.C.

                           By: Roger K. Marion, Esq.
                           488 Madison Avenue, Suite 1120
                           New York, New York 10022
                           Telephone: 212-658-0350
                           Facsimile: 212-308-8582
                           E-Mail: rmarion@rogermarion.com
                           **Attorneys for Plaintiff**

VERIFICATION

STATE OF NEW YORK        )
                         )   ss:
COUNTY OF NEW YORK  )

      Robert C. Adler, being duly sworn deposes and says:

      I am the plaintiff reflected in the caption of this Verified Complaint. I have read the foregoing Verified Complaint, and know the contents thereof; the same is true to my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to the matters, I believe them to be true.

_____
Robert C. Adler

Sworn to before me this
16th day of November, 2020

_____
Notary Public

13